**PUERTO RICO PORTS AUTHORITY, Petitioner,**

v.

**FEDERAL MARITIME COMMISSION, Respondent.**

**Port of Ponce, Intervenor.**

**No. 90–1418.**

United States Court of Appeals, First Circuit.

Heard Oct. 30, 1990.

Decided Nov. 27, 1990.

Eugene D. Gulland, with whom William H. Allen, William E. O'Brian, Jr. and Covington & Burling, Washington, D.C., were on brief, for petitioner, Puerto Rico Ports Authority.

Carol J. Neustadt, Atty., Federal Maritime Com'n, with whom Robert D. Bourgoin, Gen. Counsel, Washington, D.C., was on brief for respondent, Federal Maritime Com'n.

Robert J. Wiggers, Atty., Dept. of Justice, with whom James F. Rill, Asst. Atty. Gen., Judy L. Whalley, Deputy Asst. Atty. Gen., and Robert B. Nicholson, Atty., Dept. of Justice, Washington, D.C., were on brief, for respondent, U.S.

Francis W. Fraser, with whom Ragan & Mason, Washington, D.C., was on brief, for Port of Ponce, intervenor.

Before CAMPBELL, Circuit Judge, TIMBERS,[*] Senior Circuit Judge, and CYR, Circuit Judge.

TIMBERS, Circuit Judge:

Petitioner Puerto Rico Ports Authority (PRPA) seeks review of an order of the

[*] Of the Second Circuit, sitting by designation.

Federal Maritime Commission (FMC or Commission), dated April 25, 1990, holding that PRPA's collection of a port service charge at Ponce was unjust and unreasonable in violation of the Shipping Acts of 1916 (1916 Act) and 1984 (1984 Act) (collectively Shipping Acts). It ordered PRPA to cease collecting the port service charge at all ports in Puerto Rico.

On this petition, the critical issue raised by petitioner is whether the Commission properly exercised jurisdiction over the claims of complainant, Port of Ponce (Ponce).

For the reasons which follow, we hold that the Commission does not have jurisdiction over PRPA's port service charge at Ponce. We grant the petition for review, vacate the order of the Commission and remand with instructions to dismiss Ponce's complaint. Since we hold that the Commission did not have jurisdiction, we do not reach the substantive issues raised.

I.

We shall summarize only those facts and prior proceedings believed necessary to an understanding of the issues raised on appeal.

PRPA is an agency of the Commonwealth of Puerto Rico. Puerto Rico's Dock and Harbor Act statutorily charged PRPA with controlling the navigation and marine trade in the navigable waters of Puerto Rico. 23 L.P.R.A. § 2201. PRPA also is authorized to levy fees for general harbor services and supervision it provides within the navigable harbors. *Id.* at § 2506. PRPA's tariff defines "port service charges" as "[t]he charge assessed against a vessel for entering a port and receiving the benefit of general services rendered by the Ports Authority such as contribution to maintenance dredging and construction of dykes, Port Captain office services, lookout station, radio communication, harbor cleaning, law enforcement and others." It levies its port service charge at the ports of San Juan, Mayaguez and Ponce. Vessels are assessed port service charges based on

their gross tonnage. While the harbor service fee is the same at each port, services provided at each differ according to their individual needs. PRPA also controls and manages the port terminals at San Juan and Mayaguez. *Id.* at § 336. At these ports PRPA assesses additional charges solely related to wharfage (cargo passing over a terminal or wharf) and dockage (berthing at a terminal).

Ponce, an agency of the municipality of Ponce, operates its own terminal facilities pursuant to a 1911 franchise from the Commonwealth. Ponce filed the instant complaint with the Commission on March 9, 1988 alleging, *inter alia*, that PRPA was a "marine terminal operator" within the meaning of the 1984 Act, and that PRPA's port service charges were unjust and unreasonable in violation of § 17 of the 1916 Act and § 10(d)(1) of the 1984 Act. 46 U.S.C.App. §§ 816 and 1709(d)(1) (1988).

Section 10(d)(1) of the 1984 Act tracks the language of § 17 of the 1916 Act except that it substitutes the term "marine terminal operator" for "other person subject to this chapter". The legislative history to the 1984 Act explains that the description of "marine terminal operator" was taken directly from the 1916 Act's definition of "other person subject to the chapter". H.R.Rep. No. 53, 98th Cong., 2d Sess., pt. 1, at 29, *reprinted in* 1984 U.S.Code Cong. & Admin.News 167, 194. For this reason, the legislative history and previous interpretations of the 1916 Act's provisions have continuing precedential effect. *Plaquemines Port v. Federal Maritime Commission*, 838 F.2d 536 (D.C.Cir.1988).

PRPA moved to dismiss the complaint for lack of jurisdiction on the part of the Commission. It contended that, since it did not operate terminal facilities at Ponce, it was not an "other person subject to this [Act]" or a "marine terminal operator" as defined by the 1916 and 1984 Acts. 46 U.S.C.App. §§ 801 and 1702(15). On June 22, 1989, the administrative law judge (ALJ), Joseph N. Ingolia, issued an initial decision (I.D.), holding that the Commission does have jurisdiction over PRPA's operations at Ponce. The ALJ further held that collecting a port service fee at Ponce was unreasonable, in violation of § 17 of the 1916 Act and § 10(d)(1) of the 1984 Act.

Both parties filed exceptions to the initial decision. On April 25, 1990, the Commission issued its report and order which adopted the initial decision of the ALJ in substantial part. Relying on *Louis Dreyfus Corp. v. Plaquemines Port, Harbor and Terminal Dist.*, 21 Pike and Fischer Shipping Regulation Reports (S.R.R.) 219 (I.D.1981), *adopted,* 21 S.R.R. 1072 (FMC 1982), *appeal dismissed,* No. 82–1941 (D.C. Cir. May 17, 1983) (*Plaquemines I*) and *New Orleans Steamship Ass'n v. Plaquemines Port, Harbor and Terminal Dist.*, 23 S.R.R. 1363 (FMC 1986), *aff'd,* 838 F.2d 536 (D.C.Cir.1988) (*Plaquemines II*), the Commission held that PRPA is a "marine terminal operator" or "other person", since PRPA exercises "control" over the Ponce terminal operations. The Commission held that "what is necessary for jurisdiction to lie is not a pre-determined level of activity, but rather enough control to have an effect of a nature the shipping statutes were enacted to regulate." The Commission found that PRPA exercised control over Ponce in two respects: (1) its tariff provides that "[n]o vessel may leave port without first having paid the amount of the port service charges" and that "[t]he authority or his representative may detain any outgoing vessel until payment has been made of the port service charges"; and (2) it has the "authority and ability" to provide "different" (i.e. lesser) services at Ponce for the same fees that are charged at San Juan and Mayaguez. PRPA accordingly can affect where vessels ultimately decide to call. Since there was a disparity between the fees collected and the services provided, the Commission also held that PRPA's port service charge at Ponce was unreasonable and violative of § 17 of the 1916 Act and § 10(d)(1) of the 1984 Act.

PRPA has petitioned for review of the Commission's order, arguing that (1) the Commission lacked jurisdiction to hear these claims; (2) it should have abstained; and (3) its practice of collecting port service fees was reasonable.

## II.

### (A)

We turn first to the issue of whether the Commission properly exercised jurisdiction over PRPA and its port service charge levied at Ponce. Our inquiry is governed by the Supreme Court's decision in *Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 842 (1984) (citations omitted):

"When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction of the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute."

The parties agree that for the purposes of our review the first prong of *Chevron* is controlling. We therefore must give effect to the unambiguously expressed intent of Congress. The Commission asserts that its jurisdiction should be upheld under the first prong. It contends that the instant order is "in accord with the statute".

By contrast, PRPA contends that the Shipping Acts expressly limit the reach of the Commission's jurisdiction. The Shipping Acts provide that only those persons engaged in the business of furnishing terminal facilities are subject to the Commission's jurisdiction. 46 U.S.C.App. § 1709(d)(1). PRPA contends that the imposition of a port service charge at Ponce does not transform it into one who is in the business of furnishing terminal facilities.

It contends that this view is supported by the legislative history. We agree.

Section 10(d)(1) of the 1984 Act provides, in relevant part, that no "marine terminal operator may fail to establish, observe, and enforce just and reasonable regulations and practices relating to or connected with the receiving, handling, storing, or delivering property." *Id.* at § 1709(d)(1). A "marine terminal operator" is defined at § 3(15) as a person engaged "in the business of furnishing wharfage, dock, warehouse, or other terminal facilities in connection with a common carrier". *Id.* at § 1702(15). In order to uphold the Commission's exercise of jurisdiction in the instant case, we would have to conclude that, through the imposition of its harbor service fee, PRPA has become a "marine terminal operator" or "other person" as defined by the Shipping Acts. Since we are guided by the Supreme Court's decision in *Chevron*, we cannot reasonably conclude that PRPA has assumed the role of marine terminal operator at Ponce.

*Chevron* holds that, where the intent of Congress is clear, the inquiry is at an end for both the courts and the agency. *Chevron, supra*, 467 U.S. at 842–43. A plain reading of §§ 3(15) and 10(d)(1) of the 1984 Act demonstrates that Congress did not intend that PRPA's activities at Ponce be subject to regulation under the Shipping Acts. PRPA, under any plausible interpretation, is not in the "business of furnishing wharfage, dock, warehouse, or other terminal facilities in connection with a common carrier" at the Port of Ponce. *Plaquemines I, supra*, 21 S.R.R. at 1083 (FMC 1982) (Moakley, dissenting) ("Plaquemines does not own or operate any facilities serving common carriers by water. This [fact] should end the [jurisdictional] inquiry."). PRPA's sole function at Ponce is to provide such general harbor services as law enforcement, radio communications, harbor cleaning, and port captain services. While PRPA may furnish terminal facilities at San Juan and Mayaguez, the Commission properly did not base its jurisdiction on those activities. We hold that PRPA, through the imposition of a harbor service

fee at Ponce, has not subjected itself to the jurisdiction of the Commission.

We are cognizant of the ongoing debate over whether deference should be accorded to an agency interpreting the scope of its own jurisdiction. *Compare Mississippi Power & Light Co. v. Mississippi ex rel. Moore,* 487 U.S. 354, 381 (1988) (Scalia, J., concurring) ("it is plain that giving deference to an administrative interpretation of its statutory jurisdiction or authority is both necessary and appropriate") and *Commodity Futures Trading Comm'n v. Schor,* 478 U.S. 833, 845 (1986) (on the facts of this case agency interpretation of its own jurisdiction is entitled to deference) *with Mississippi Power & Light, supra,* 487 U.S. at 387 (Brennan, J., dissenting) ("This Court has never deferred to an agency's interpretation of a statute designed to confine the scope of its jurisdiction") and *New York Shipping Ass'n v. Federal Maritime Comm'n,* 854 F.2d 1338, 1363 (D.C. Cir.1988) (inappropriate to defer to agency where it is interpreting a statute delineating its jurisdiction), *cert. denied,* 488 U.S. 1041 (1989). *See also* Sunstein, *Constitutionalism After the New Deal,* 101 Harv.L. Rev. 421, 467 (1987) (notion that administrators should decide the scope of their own authority flatly contradicts separation-of-powers principles dating back to *Marbury v. Madison* and to *The Federalist No. 78* ); Note, *Coring the Seedless Grape: A Reinterpretation of Chevron U.S.A., Inc. v. NRDC,* 87 Colum.L.Rev. 986, 1005–06 (1987) (danger of "aggrandizement" where agency allowed to interpret the scope of its own authority).

We need not attempt to emerge from this morass, however, to reach our holding today. The first prong in *Chevron* expressly prohibits an agency from "alter[ing] the clearly expressed intent of Congress." *Board of Governors v. Dimension Financial Corp.,* 474 U.S. 361, 368 (1986). Since the statute here involved is clear on its face, we are not obliged to "rubber-stamp" an administrative decision that is "inconsistent with a statutory mandate". *NLRB v. Brown,* 380 U.S. 278, 291 (1965).

The Commission and Ponce cite numerous decisions which they contend support the proposition that certain auxiliary services performed in connection with terminal facilities, in and of themselves, are subject to regulation under the Shipping Acts. *American Export–Isbrandtsen Lines, Inc. v. Federal Maritime Comm'n,* 389 F.2d 962 (D.C.Cir.1968); *Greater Baton Rouge Port Comm'n v. United States,* 287 F.2d 86, 89–90 (5th Cir.1961), *cert. denied,* 368 U.S. 985 (1962); *Petchem, Inc. v. Canaveral Port Authority,* 23 S.R.R. 974 (FMC 1986), *aff'd,* 853 F.2d 958 (D.C.Cir.1988); *A.P. St. Philip, Inc. v. Atlantic Land & Improvement Co.,* 13 F.M.C. 166, 167 (1969); *Philippine Merchants Steamship Co. v. Cargill, Inc.,* 9 F.M.C. 155, 163 (1965). In our view, however, they mischaracterize the holdings of those cases. The cited cases implicitly or expressly speak to the second half of the jurisdictional inquiry under § 10(d)(1): whether certain services provided by one who is concededly a terminal operator actually are "relat[ed] to or connected with receiving, handling, storing or delivering property." *See infra* § IIB.

█ We agree with the holdings of the cited cases that some activities that do not involve the actual physical handling of cargo are subject to the reach of the Shipping Acts when performed by a marine terminal operator and related to receiving, handling, storing, or delivering property. Contrary to the parties' assertions, however, those activities alone are not sufficient to confer jurisdiction on the Commission. To support the exercise of Commission jurisdiction, it must be determined initially that the one providing the service is a marine terminal operator—in the business of furnishing wharfage, dock, warehouse, or other terminal facilities in connection with a common carrier. Only then may a court turn to the second half of the jurisdictional inquiry under § 10(d)(1) and determine whether certain activities are related to or connected with receiving, handling, storing, or delivering property.

(B)

■ Even assuming arguendo that we were to hold that PRPA was a marine terminal operator, we would not conclude that its activities at Ponce were related to or connected with the receiving, handling, storing or delivering of property. *Bethlehem Steel Corp. v. Indiana Port Comm'n,* 21 F.M.C. 629, 632 (1979), *aff'd per curiam,* 642 F.2d 1215 (D.C.Cir.1980). In *Bethlehem Steel,* the Commission found that, although the Indiana Port Commission was an "other person" subject to the 1916 Act's regulation, its harbor service charge was not subject to FMC jurisdiction since it was not related to or connected with the "receiving, handling, storing or delivering of property". *Id.* at 633. The Commission emphasized:

"[i]t does not follow that all of the Port's activities are subject to section 17 simply because the Port is a terminal operator or 'other person' with respect to some of its practices and regulations. Neither does the issue turn solely on whether the vessels on which the charge is levied enter the harbor for the purpose of loading or unloading cargo. The fact that most of the vessels' business in the Harbor is cargo-related is, taken alone, an insufficient justification for classifying the charge as one 'relating to or connected with the receiving, handling, storing or delivering of property.'"

*Id.* at 632.

The Commission in *Bethlehem Steel* found the nature of the charge significant. Proceeds from the service charge were earmarked for construction of *"the Harbor itself, i.e., the container for the water to a navigable depth, in contrast with the construction of pier facilities".* *Id.* (emphasis in original) (quoting *Indiana Port Comm'n v. Federal Maritime Comm'n,* 521 F.2d 281, 285 (D.C.Cir.1975)). It thus drew a distinction between navigational and terminal services. A service charge that was related solely to navigation would not be subject to the Commission's jurisdiction, while charges relating to terminal facilities would come within the Commission's jurisdiction. The Commission's order was affirmed on appeal. *Bethlehem Steel Corp. v. Federal Maritime Comm'n,* 642 F.2d 1215, 1216 (D.C.Cir.1980).

The port service charge at Ponce is related closely to navigational aspects of the port. All services listed in PRPA's tariff are related to navigation within the harbor. Moreover, the terminal facilities in the port are under the exclusive administration and control of the Port of Ponce by virtue of a 1911 franchise from the government of Puerto Rico. PRPA is excluded expressly by statute from controlling or administering any terminal facilities controlled by municipalities. 23 L.P.R.A. § 2202. Under the navigational-terminal distinction set forth in *Bethlehem Steel,* PRPA's activities at Ponce would not be related to the receiving, handling, storing or delivering of property. Federal Maritime Commissioner Moakley, the sole voice crusading against the seemingly unfettered reach of the Commission's jurisdiction, has long advocated such a position. *Plaquemines II, supra,* 23 S.R.R. at 1379 (FMC 1986) (Moakley, dissenting) (assuming that "the Port could meet the definition of Marine Terminal Operator, the Commission has no greater claim to regulate its police, health and fire protection services than we would have to regulate an amusement park operated by the Port"); *Plaquemines I, supra,* 21 S.R.R. at 1083 (FMC 1982) (Moakley, dissenting) ("[t]he Shipping Act does not provide a cure for every practice that takes place in ocean transportation nor does it vest in the Commission the right to determine that actions taken by a litigant are so offensive that we must assume jurisdiction."); *Petchem, supra,* 23 S.R.R. at 996 (FMC 1976) (Moakley, concurring) ("the distinction between navigational and terminal services that the Commission articulated in the *Bethlehem Steel* decision seems a logical interpretation of our authority over port functions and a proper narrowing of the broad [construction of our jurisdiction]").

The Commission attached considerable significance to the fact that the harbor fee in *Bethlehem Steel* was used "to recoup harbor construction costs" and clearly was navigational in nature while the port service charge in the instant case is not as

"apparently navigation-related". We believe that the Commission misreads the holding in that case. In *Bethlehem Steel,* the Commission merely used the navigation-terminal distinction to illustrate that the harbor charge was unrelated to cargo handling and thus not subject to their jurisdiction. *Bethlehem Steel, supra,* 21 S.R.R. at 633 (FMC 1979). Whether the harbor charge here is not as "apparently navigation-related" is not the critical inquiry. The critical aspect of the charge here involved, like the charge in *Bethlehem Steel,* is that it is unrelated to receiving, handling, storing or delivering of property.

The Commission attempts further to distinguish *Bethlehem Steel* by stating that Indiana Port actually performed the service listed in its tariff while PRPA does not provide all of its enumerated services. Again, we believe that inquiry is irrelevant to the threshold jurisdictional question. A service that is not performed by a marine terminal operator nor related to receiving, handling, storing or delivering of property does not come within the Commission's jurisdiction simply because it is unreasonable. The reasonableness of a charge is considered when determining whether there has been a substantive violation under the Shipping Acts. To incorporate this inquiry into the jurisdictional determination is to grant the Commission a roving license to correct any inequity tangentially related to ocean transportation. This result was never intended by the drafters of the Shipping Acts. *See infra* § IID.

If we had overcome the initial hurdle and concluded that PRPA was a "marine terminal operator", we still would not have upheld the Commission's exercise of jurisdiction because PRPA's harbor service fee was not related to or connected with the receiving, handling, storing or delivering of property.

### (C)

Notwithstanding the express language of the statute, the Commission relies on *Plaquemines II, supra,* 838 F.2d at 542–43, to support its assertion of jurisdiction. They urge us to adopt the *Plaquemines*

"control theory" of jurisdiction. We decline the invitation. We need not deal squarely with the court's holding in *Plaquemines* or its method of statutory analysis since we hold that *Plaquemines* is distinguishable from the instant case.

The Commission and the Court of Appeals in *Plaquemines II* adopted many of the factual findings and conclusions of law set forth in *Plaquemines I.* The factual findings showed that Plaquemines Port levied a harbor fee on all "commercial cargo vessels which dock, moor, or anchor" within the Port. The fee was used to provide police, fire, and emergency services at the Port. The tariff provided that any vessel failing to pay the fee would be denied "access to the Port *and the private facilities* within its jurisdiction." (emphasis added). All of the terminal facilities in the Port were privately owned. Although it did not own the private terminal facilities, the Port "retain[ed] administrative authority and control over the private wharves and other terminal facilities in the Port, including control over the fees and charges exacted by the owners of private facilities for their use by the public." *Plaquemines I, supra,* 21 S.R.R. at 229. The petitioner, New Orleans Steamship Association, filed a complaint alleging that the tariff was unreasonable in violation of §§ 16 and 17 of the 1916 Act. After first finding that the Commission had jurisdiction, the ALJ found that the tariff was discriminatory in some respects but ultimately lawful.

After reviewing the exceptions of both parties, a divided Commission upheld the ALJ's decision. It reaffirmed the jurisdictional findings in *Plaquemines I* by holding that the Port is a marine terminal operator subject to the 1984 Act:

"its exclusive ability to provide essential health, safety and security services to vessel and cargo interests in commercial cargo handling transactions, its assessment of selective cargo transfer fees, and its control of access to private terminal facilities results in fundamental control over the rates and practices of terminal facilities. Further, the Port's practice of assessing, on the basis of cargo

transactions, a fee for providing to vessels and cargo essential health, safety and security services constitutes the furnishing of 'other terminal facilities' within the meaning of the 1984 Act."

*Plaquemines II, supra,* 23 S.R.R. at 1372.

On appeal, the Port dropped its jurisdictional argument and conceded that the Commission had jurisdiction over its harbor fee. Nevertheless, the District of Columbia Court of Appeals addressed the jurisdictional issue at the request of the statutory respondent, the United States Department of Justice. *Plaquemines II, supra,* 838 F.2d at 541. Relying heavily on the legislative history, the court agreed with the Commission's findings. It held that the "Port's combination of offering essential services and controlling access to the private facilities amounts to the furnishing of terminal facilities." *Id.* at 543. The court stated that "the critical issue for jurisdiction is that the degree of the Port's involvement enables the Port to discriminate." *Id.* It concluded that Plaquemines Port "has the ability to discriminate in the fees it charges by controlling access to private terminal facilities." *Id.*

The Commission relied on the reasoning of the District of Columbia Court of Appeals in *Plaquemines II* to reach its holding in the instant case. The Commission held that PRPA exercises control over the terminal facilities at Ponce in two respects. First, since PRPA's tariff requires the payment of a harbor fee by all vessels calling at ports in Puerto Rico, it controls access to the port itself. Second, by providing less services at Ponce vis-a-vis other ports, PRPA effectively influences the choice of where the vessels will call.

We believe that the Commission's reliance on *Plaquemines II* in the instant case is misplaced. The Port in *Plaquemines II* had complete control over the private terminals, including the amount of fee the terminals charged. The Commission found that Plaquemines Port administered and controlled all privately owned docks and wharves within its geographical jurisdiction. The Port had complete control over the fees and charges levied by the owners of private terminal facilities. Through its plenary control over the private terminal facilities, the Port became a *de facto* terminal operator.

By contrast, Puerto Rico law specifically exempts the private terminal facilities at Ponce from PRPA's "control and administration". 23 L.P.R.A. § 2202. Ponce is solely responsible for establishing the wharfage and dockage charges. Ponce's Port Director, Jose S. Gonzalez, conceded that Ponce was "completely autonomous of the Puerto Rico Ports Authority." Further, in *Plaquemines II,* the Port levied a tariff on all vessels which dock, moor, or anchor within the Port. An additional tariff was levied on all cargo over 500 tons transferred within the Port. The Commission found that these charges were "rendered to vessel and cargo interests in commercial, cargo-handling transactions" and closely related to terminal activities, whereas the charges levied here are based on the gross tonnage of a vessel entering Ponce. In short, unlike the private terminal owners in *Plaquemines II,* Ponce has complete control over its terminal facilities and dockage charges.

Since we conclude that PRPA did not exercise the type of plenary control over Ponce terminal facilities that the Port exercised over private terminal facilities in *Plaquemines II,* we need not consider the mode of statutory analysis employed by the Commission and the District of Columbia Court of Appeals. *Compare Chevron, supra,* 467 U.S. at 842.

(D)

The legislative history demonstrates that our holding today is consistent with the intent of Congress in enacting the Shipping Acts. The Shipping Acts were designed to strengthen the United States shipping industry. At the outset of World War I, the shipping industry in the United States was lagging far behind its international competitors. In the years immediately preceding the war about ninety percent of all United States' water-carried exports were shipped in foreign vessels. 53 Cong.Rec. 8089 (1916). Congress recognized that in order

for the United States shipping industry to survive and prosper in an international climate dominated by shipping cartels ("conferences"), it must grant antitrust immunity to the shipping cartels. Essay, *The Shipping Act of 1984: A Return to Antitrust Immunity*, 14 Transp. L.J. 153, 155–56 (1985). To ensure that shipping monopolies did not result, however, Congress implemented a scheme of regulation which, among other things, provided for disclosure of all conference agreements, established the United States Shipping Board (predecessor of the Federal Maritime Commission), and prohibited discrimination in shipping. 53 Cong.Rec. 8089–95. Congress realized that in order to regulate effectively the practices of water carriers, the Shipping Board also must "have supervision of all those incidental facilities connected with the main [water] carriers". 53 Cong.Rec. 8276. This concern led Congress to regulate "other persons" who carry on the business of furnishing wharfage, dock, warehouse, or other terminal facilities. *Id.*

The legislative history illuminates the extent to which municipal governments were subject to the Act. Representative Alexander, the floor manager of the bill, emphasized that if local governmental entities operate ports facilities "there is no reason why they should not be amenable to the law as well as a private person". *Id.* When Representative Alexander was asked whether the term "other person" was included in the legislation to take away the control of municipal wharves from the cities, he replied, "[n]ot at all; only to prevent unjust discrimination between shippers." *Id.* This indicates that Congress only intended to regulate local governmental agencies when they discriminated in their role as operators of municipal wharves. The legislative history is devoid of any indication whatsoever that Congress intended to regulate local governmental entities when they were acting in a capacity other than "marine terminal operator" or "other person".

The Supreme Court has examined the legislative history and considered whether governmental entities should be regulated under the 1916 Act. In *California v. United States*, 320 U.S. 577, 585 (1944), the Court emphasized that the term "other person subject to the Act" should be "read in light of the circumstances that gave rise to its enactment and for which it was designed". Consistent with Congressional intent and the language of the Act, the Court held that, since California and Oakland furnished terminal facilities, they were subject to the Act. *Id.* That holding reaffirms that Congress intended to regulate the conduct of local governmental entities when they were acting as "marine terminal operators" or "other persons subject to the Act".

The legislative history also suggests that Congress sought to confine rather than broaden the scope of the term "other person subject to the Act". Congress narrowed the reach of the statute by amending original drafts of the 1916 Act to delete "ferrying", "towing", "transfer", and "lighterage" from the definition of "other person" in the Act. *United States v. American Union Transport*, 327 U.S. 437, 452 (1946). It would strain reason to conclude that Congress intended to regulate something as tangential to the movement of cargo as a local government's harbor fee while at the same time excluding certain other activities which seemingly are more vital to the movement of cargo.

In short, nothing in the language of the Shipping Acts, its legislative history or decisions of the Supreme Court indicates that Congress intended to regulate local governments when they were acting in such traditional governmental roles as providing police and regulatory functions. Indeed, the evidence is to the contrary. Nor has the Commission demonstrated how PRPA's harbor service charge at Ponce is inimical to the purpose of the Shipping Acts—to prevent discrimination between shippers or, in the context of the instant case, to prevent discrimination in the provision of terminal facilities. The port service charge is levied at the same rate on all carriers engaged in the commercial maritime trade. It in no way discriminates between shippers or leads to discrimination in the furnishing of terminal facilities. Imposition of

808

a port service fee at Ponce to offset the costs of traditional governmental services does not implicate the type of discrimination the Shipping Acts were designed to eliminate.

### III.

To summarize:

A plain reading of the 1984 Act delineates the meaning of marine terminal operator. A marine terminal operator is a person who is engaged in the business of furnishing wharfage, dock, warehouse, or other terminal facilities in connection with a common carrier. Through its imposition of a port service charge at Ponce, PRPA has not become a marine terminal operator.

Even assuming arguendo that PRPA was a marine terminal operator, we would not conclude that its activities at Ponce were related to or connected with receiving, handling, storing or delivering of property.

We hold that the Commission lacks jurisdiction over PRPA's port service charge at Ponce. We do not reach the substantive issues raised.

The petition for review is granted; the order of the Commission is vacated; and the case is remanded with instructions to dismiss the complaint.