**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 15-1088

UNITED STATES EX REL. KURT BUNK AND RAY AMMONS,

Plaintiffs – Appellants,

and

UNITED STATES EX REL. DANIEL HEUSER,

Plaintiff,

v.

GOVERNMENT LOGISTICS N.V.,

Defendant – Appellee,

and

BIRKART GLOBISTICS GMBH & CO. LOGISTIK UND SERVICE KG; THE PASHA GROUP; ANDREAS CHRIST SPEDITION & MOBELTRANSPORT GMBH; JOHN DOE, 1-100; AMERICAN MOPAC INTERNATIONAL, INCORPORATED; DOE DEFENDANTS; GATEWAYS INTERNATIONAL; ALLIED FREIGHT FORWARDERS; NORTH AMERICAN VAN LINES, INC.; GLOBAL WORLDWIDE INCORPORATED; AIR LAND FORWARDERS SUDDATH; COVAN INTERNATIONAL; JET FORWARDING INCORPORATED; ARPIN INTERNATIONAL; BIRKART GLOBISTICS AG; THIEL LOGISTIK AG; VIKTORIA SCHAFER INTERNATIONALE SPEDITION GMBH; VIKTORIA-SKS KURT SCHAFER INTERNATIONALE GMBH & CO., KG; GILLEN & GARCON GMBH & CO. INTERNATIONALE SPEDITION KG; GILLEN & GARCON GMBH & CO. KG; M.T.S. HOLDING & VERWALTUNGS GMBH, d/b/a M.T.S. Gruppe; ANDREAS CHRIST GMBH; MICHAEL VILLINGER; ERWIN WEYAND; NICODEMUS GOSSELIN; DIETER SCHMEKEL; JURGEN GRAF; HORST BAUR; KURT SCHAFER; MARTINA SCHAFER; BIRKART VERMOGENSVERWALTUNG GMBH; LOGWIN AIR + OCEAN DEUTSCHLAND GMBH; LOGWIN HOLDING DEUTSCHLAND GMBH; MISSY DONNELLY; GEORGE PASHA; AMERICAN SHIPPING INCORPORATED; CARTWRIGHT INTERNATIONAL VAN LINES INCORPORATED; JIM HAHN; INTERNATIONAL SHIPPERS ASSOCIATION

INCORPORATED; GOSSELIN WORLDWIDE MOVING, N.V.; GOSSELIN GROUP N.V.; MARC SMET; GOSSELIN WORLD WIDE MOVING, N.V.; VIKTORIA INTERNATIONAL SPEDITION; JEFFREY CARLL COFFMAN; ITO MOBEL TRANSPORT GMBH,

Defendants.

------------------------------

UNITED STATES ATTORNEY GENERAL,

Amicus Curiae.

---

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria. Anthony John Trenga, District Judge. (1:02-cv-01168-AJT-TRJ; 1:07-cv-01198-AJT-TRJ)

---

Argued: September 21, 2016          Decided: November 15, 2016

---

Before KING, SHEDD, and THACKER, Circuit Judges.

---

Vacated and remanded by published opinion. Judge King wrote the opinion, in which Judge Shedd and Judge Thacker joined.

---

**ARGUED**: John Edgar Petite, GREENSFELDER, HEMKER & GALE, PC, St. Louis, Missouri, for Appellant. William Francis Coffield, IV, Laina Catherine Wilk Lopez, BERLINER CORCORAN & ROWE LLP, Washington, D.C., for Appellee. Michael Shih, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Amicus United States of America. **ON BRIEF**: Ann Lugbill, Mark Hanna, Lauren Hoff-Downing, MURPHY ANDERSON PLLC, Washington, D.C.; Richard E. Greenberg, GREENSFELDER, HEMKER & GALE, PC, St. Louis, Missouri, for Appellant. Benjamin C. Mizer, Principal Deputy Assistant Attorney General, Michael S. Raab, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Dana J. Boente, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Amicus United States of America.

---

KING, Circuit Judge:

We are for the third time entertaining this complex matter, which began more than fifteen years ago as a bid-rigging scheme conjured up by shipping businesses to defraud the United States. In 2004, Gosselin Group N.V. (then known as Gosselin World Wide Moving, N.V.) and another business entity entered conditional guilty pleas in the Eastern District of Virginia to a pair of criminal conspiracy offenses. The district court thereafter dismissed one of those charges, and cross-appeals ensued. We determined in those appeals that the defendants were criminally liable for both conspiracies and remanded for resentencing. See United States v. Gosselin World Wide Moving, N.V., 411 F.3d 502 (4th Cir. 2005).

More recently, in the qui tam proceedings at issue herein, a jury returned a verdict in 2011 against three defendants that we collectively refer to as the "Gosselin defendants": Gosselin Group; Gosselin Worldwide Moving, N.V.; and Marc Smet, Gosselin Group's Chief Executive Officer and former Managing Director. Appeals were pursued by the United States and by relators Kurt Bunk and Ray Ammons (together, the "Relators"), who contested the district court's refusal to award civil penalties. We granted relief, directing the court to enter judgment on a claim pursued by Bunk in the sum of $24,000,000 — to be levied against the Gosselin defendants — and remanding for further proceedings.

See United States ex rel. Bunk v. Gosselin World Wide Moving, N.V., 741 F.3d 390 (4th Cir. 2013).

On remand, the district court was called upon to resolve the issue of whether Bunk was entitled to recover his judgment from another defendant, Government Logistics N.V. ("GovLog"), which was alleged to be a successor corporation to Gosselin Group. In disposing of the successor corporation liability issue, the court ruled against Bunk on two bases. See United States ex rel. Bunk v. Birkart Globistics GmbH & Co., No. 1:02-cv-01168 (E.D. Va. Dec. 23, 2014), ECF No. 1362 (the "Decision"). First, the court decided that the successor corporation liability claims against GovLog should be dismissed because they had been inadequately pleaded. In the alternative, the Decision rejected those claims on the merits and awarded summary judgment, ruling that there was insufficient evidence to justify a trial. The Relators have appealed from the judgment, and as explained below, we are satisfied that the court erred. We therefore vacate and remand.

I.

Two government programs that facilitate the shipment of household goods belonging to military and domestic personnel to

and from Europe have been at the center of this litigation.[1] The first, known as the International Through Government Bill of Lading ("ITGBL") program, involves the solicitation of bids by the Department of Defense (the "DOD") from domestic freight forwarders who then subcontract their foreign operations to overseas businesses. The second, known as the Direct Procurement Method ("DPM") program, involves the solicitation of bids by the DOD directly from foreign businesses. Both programs were, as relevant to the bid-rigging conspiracy, administered by the Army's Military Transport Management Command (the "MTMC").[2]

Beginning in about 2001, the Gosselin defendants and at least one other entity, The Pasha Group, agreed to and implemented the bid-rigging scheme. Their scheme substantially increased the prices that the DOD paid to the culprits for shipping household goods belonging to military and diplomatic personnel to and from Europe under the ITGBL and DPM programs. As a result of what we characterized in the 2005 criminal appeals as "naked bid rigging," the DOD paid millions of dollars more to the conspirators than it should have paid.  See

---

[1] Because we are assessing the award of summary judgment, we recite the facts in the light most favorable to the Relators. See Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir. 2003).

[2] The MTMC is now the Army's Surface Deployment and Distribution Command.

Gosselin, 411 F.3d at 508. The bid-rigging scheme did not go undetected, as it resulted in these qui tam proceedings and the successful criminal prosecutions.

## A.

In 2002, the Relators instituted these qui tam proceedings under the False Claims Act (the "FCA").[3] The Relators operated businesses that provided to the DOD services much like those performed by Gosselin Group and Pasha. Bunk filed his qui tam action in the Eastern District of Virginia on August 2, 2002, alleging an FCA claim related to the DPM program (the "DPM claim").[4] Ammons filed his qui tam action in the Eastern District of Missouri on September 17, 2002, alleging FCA claims related to the ITGBL program (the "ITGBL claim") and to Gosselin Group's exertion of pressure on Covan International (the "Covan claim") and Cartwright International Van Lines (the "Cartwright claim") to submit higher ITGBL bids. Both qui tam actions were

---

[3] The FCA, codified at 31 U.S.C. §§ 3729-3733, imposes liability on individuals and entities who defraud government programs. A claim under the FCA can be instituted by the United States or by a private individual (i.e., a relator) via a qui tam action. See 31 U.S.C. § 3730(a)-(b). The government may intervene in a qui tam action. Id. § 3730(b)(2). If a qui tam action is successful, the relators are entitled to share with the government in the award. Id. § 3730(d).

[4] Bunk initially filed his qui tam action with another relator, Daniel Heuser, who has since withdrawn from the litigation.

commenced under seal, pursuant to 31 U.S.C. § 3730, and remained sealed and pending in the district courts during the criminal proceedings.

B.

On November 13, 2003, a grand jury in the Eastern District of Virginia returned a two-count indictment against Gosselin Group and Smet, charging them with conspiracy to restrain trade, in violation of 15 U.S.C. § 1, and conspiracy to defraud the United States, in contravention of 18 U.S.C. § 371. Describing the manner and means of the conspiracy to restrain trade, the two-count indictment specified that Gosselin Group, Smet, and their co-conspirators "participat[ed] in meetings and conversations to discuss and agree upon a strategy to eliminate the prime rates" in specific transportation routes, or channels, "from Germany to the United States for the transportation of military household goods." See Indictment, United States v. Gosselin World Wide Moving, N.V., No. 1:03-cr-00551, at ¶ 16 (E.D. Va. Nov. 13, 2003), ECF No. 19. The indictment further alleged that Gosselin Group and Smet engaged in "written exchanges and other communications" to ensure other freight forwarders would not match the rates set by "a certain co-conspirator U.S. freight forwarder" and would cancel any rates lower than the second highest rate in channels from Germany to the United States. Id. The indictment charged the same with

7

respect to the conspiracy to defraud the United States. Id. ¶ 25 (alleging that Gosselin Group and Smet "discussed and agreed upon a strategy to eliminate the prime rates"); see also id. ¶¶ 26-27.

In February 2004, Gosselin Group and Pasha agreed to be charged and prosecuted by criminal information in the Eastern District of Virginia for those same conspiracy offenses. By plea agreements with the United States Attorney, Gosselin Group and Pasha also agreed to plead guilty to the two charges alleged in the information. Smet, who signed Gosselin Group's plea agreement individually and on behalf of Gosselin Group, thereby escaped further criminal prosecution. That is, as a result of Gosselin Group's plea agreement being consummated, the prosecutors dismissed the indictment theretofore lodged against Gosselin Group and Smet.

Pursuant to its plea agreement, Gosselin Group admitted that, at Smet's urging, Gosselin Group and Pasha had conspired to undermine the ITGBL program's competitive bidding process by preventing "me-too bids," or matching bids, from converging to the prime through rate (i.e., the low bid for a particular route).[5] To accomplish that objective in particular channels,

---

[5] A through rate "is a payment encompassing all the costs involved in a door-to-door move of DOD personnel's household effects." See Gosselin, 411 F.3d at 505.

8

"[i]n early January 2002, [Smet] agreed in writing to pay twelve of the largest German moving agents a specified fee," and "[t]he German agents . . . agreed not to handle business from freight forwarders in those channels unless the forwarders submitted me-too bids at the second lowest level . . . or above." See Gosselin, 411 F.3d at 507. Even more, as Smet acknowledged in a writing filed with the district court, Gosselin Group, Pasha, and their co-conspirators had "provided misleading information to DOD personnel in Germany." See Statement of Facts, United States v. Gosselin World Wide Moving, N.V., No. 1:03-cr-00551, at ¶ 31 (E.D. Va. Feb. 19, 2004), ECF No. 93 (the "Statement of Facts").[6] In the end, the scheme to defraud the DOD was successful and "Gosselin was awarded a contract, effective May 1, 2001, after colluding with its fellow bidders to artificially inflate the packing and loading component of the submitted bids." See Bunk, 741 F.3d at 396. In turn, "Gosselin subcontracted much of the work, in predetermined allocations, to its supposed competitors." Id. As a result of the bid-rigging scheme, "DOD's costs to transport military household goods were

---

[6] Pursuant to Gosselin Group's plea agreement, Smet and Gosselin Group "admit[ted] the facts set forth in the [Statement of Facts] and agree[d] that those facts establish[ed] guilt for the [two conspiracy] offenses charged beyond a reasonable doubt." See Plea Agreement, United States v. Gosselin World Wide Moving, N.V., No. 1:03-cr-00551, at 4 (E.D. Va. Feb. 18, 2004), ECF No. 92.

greater than they would have been had the shipments moved at the prime through rates." See Statement of Facts ¶ 32.

The guilty pleas of Gosselin Group and Pasha were tendered to and accepted by the district court in Alexandria on February 18, 2004. Pursuant to a separate agreement between Smet and the Army, Smet was barred from doing business with the United States for three years, from March 2004 to March 2007. Soon after that agreement was executed, a so-called United States Management Team was created within Gosselin Group to handle its business — in Smet's absence — with the DOD. That team consisted of four Gosselin Group employees: Chief Operating Officer Stephan Geurts Sr., his son Stephan Geurts Jr., plus Timotheus Noppen and Ludi Bokken.

Meanwhile, Gosselin Group and Pasha exercised a reservation under their plea agreements to pursue an immunity claim in the district court, seeking dismissal of both the charges lodged in the information. In that regard, they asserted that their bid-rigging scheme was entirely immune from federal prosecution. In August 2004, the district court determined that certain provisions of the Shipping Act immunized Gosselin Group and Pasha from federal prosecution on the antitrust conspiracy

offense alleged in the information.[7] The court also ruled, however, that those defendants possessed no immunity from prosecution on the other charge, the conspiracy to defraud the United States. Gosselin Group and Pasha were therefore sentenced on the conspiracy to defraud offense only.

In 2005, the government successfully appealed to this Court the district court's immunity ruling on the antitrust conspiracy offense. Our decision rejected the proposition that Gosselin Group and Pasha were somehow immune from prosecution on that offense. See Gosselin, 411 F.3d at 505. Concomitantly, we rejected Gosselin Group's and Pasha's cross-appeals seeking immunity from prosecution on the conspiracy to defraud offense. Id. As Judge Wilkinson succinctly explained, "the Shipping Act's immunity provisions afford [the conspirators] no relief from liability for the antitrust violation and conspiracy to defraud they have admitted." Id. Concluding that Gosselin Group and Pasha were not entitled to immunity on either offense, we remanded to the district court for resentencing. Those proceedings were conducted in 2006.

---

[7] The immunity provisions of the Shipping Act invoked by Gosselin Group and Pasha were, at the time, 46 U.S.C. app. § 1706(a)(2), 46 U.S.C. app. § 1706(a)(4), and 46 U.S.C. app. § 1706(c)(1). Currently, those provisions of the Shipping Act are codified at 46 U.S.C. § 40307.

11

In the resentencing proceedings, the district court imposed a $6,000,000 fine on Gosselin Group for its offenses. It imposed two separate $4,600,000 fines on Pasha — one for each count — for an aggregate fine of $9,200,000. The court also ordered both Gosselin Group and Pasha to make restitution to the DOD for losses suffered by the MTMC, in the sum of $865,000.

## C.

In September 2006, with the criminal proceedings concluded, the Department of Justice (the "DOJ") gave the Gosselin defendants notice of the two pending qui tam actions. The DOJ lawyers detailed the false claims and bid-rigging evidence underlying the qui tam actions to the lawyers for the Gosselin defendants and advised them that the United States might intervene. Shortly thereafter, in January 2007, the DOJ communicated a settlement demand to the Gosselin defendants.

After completion of the criminal proceedings and with the civil qui tam proceedings just beginning, Smet was completely "fed up" with the DOJ and the DOD — a sentiment he expressed to Geurts Jr. See J.A. 637.[8] As Smet further explained to Noppen, his frustration arose from the "whole criminal case and everything around it." Id. at 675; see also, e.g., id. at 427

---

[8] Citations herein to "J.A. ___" refer to the contents of the Joint Appendix filed by the parties in this appeal.

12

("[Smet] was really fed up with all those chasings towards his person . . . ."). Smet thus approached Jan Lefebure, who worked as Managing Director of International Freight Forwarding Service (which handled Gosselin Group's commercial exports), with a proposal to move Gosselin Group's business with the United States into the hands of another business entity.

Lefebure owned a corporation called Brabiver, which was described by Geurts Jr. as a "company doing nothing." See J.A. 640. Notably, however, and helpful to Smet, Brabiver owned "a license for transportation or freight forwarding." Id. Smet proposed to Lefebure a scheme "to reopen [Brabiver], and to put his [i.e., Gosselin Group's] . . . government contracts into it." Id. at 426.

Joining Lefebure as principals in the Brabiver venture, as orchestrated by Smet, were Noppen, Geurts Jr., and Rene Beckers — all of whom were employed by Gosselin Group or one of its subsidiaries. On June 27, 2007, in order to carry out Smet's scheme and to capitalize Brabiver, Smet made several interest-free loans to the four principals, totalling approximately €100,000.[9] Noppen, Geurts Jr., and Beckers each received loans from Smet of more than €24,000. Lefebure received an initial

---

[9] As of June 27, 2007, €100,000 was equal to approximately $134,000. See Foreign Exchange, N.Y. Times, June 27, 2007, at C12.

loan of more than €16,000, which was later increased to more than €27,000. Notably, those interest-free loans were not secured in any way. Each loan was repayable on Smet's demand, but no demands were ever made.

On June 28, 2007, at their first and only shareholder meeting, Smet's hand-picked principals used the foregoing loans to purchase shares in and to formalize Brabiver's resurgence as GovLog — a new name selected by Smet himself. The next day, June 29, 2007, GovLog and Gosselin Group entered into a series of agreements, memorialized by contracts prepared by Smet's attorneys and presented by Smet to the GovLog principals. Two of the agreements transferred Gosselin Group's business with the DOD to GovLog, and three other agreements committed GovLog to exclusively use the services of Gosselin Group and its related entities to perform the DOD contracts.

In exchange for Gosselin Group's business with the DOD, GovLog paid nothing at the time. Instead, GovLog promised Gosselin Group a percentage of its future net revenues. The agreements transferring Gosselin Group's business with the DOD to GovLog defined those net revenues as "all of those revenues received by GovLog . . . minus the amount of the [services] invoiced by [Gosselin Group] to GovLog in connection with" the services provided to GovLog by Gosselin Group and its subsidiaries. See J.A. 832 (emphasis omitted) (regarding

14

facility services); see also id. at 839 (regarding support services). The terms of the various agreements were not even negotiated; rather, they were all dictated by Smet. After Smet's lawyers prepared the agreements, Smet simply handed them to Lefebure, who signed each on behalf of GovLog.

At no point during the implementation of the GovLog scheme did Gosselin Group consider selling or seek to sell its business interests to any entity other than GovLog. Manned with only about twenty employees — all but one of whom joined GovLog from Gosselin Group — GovLog began its DOD shipping operations on behalf of Gosselin Group on July 1, 2007.

Thereafter, the sole business of GovLog was signing contracts with the DOD and arranging shipping services for the DOD. It did not, as Lefebure said, actually do any shipping. As Lefebure testified:

> Q. . . . . Other than making the arrangements for these movements of household goods, does [GovLog] provide any other services?
>
> A. For the time being, no.

See J.A. 751. Although GovLog contracted with the DOD and GovLog's carriers to perform shipping services, Gosselin Group continued to perform nearly all those services. GovLog did not have its own warehousing facilities; it leased warehousing facilities from Gosselin Group. GovLog owned nothing except a couple of automobiles, a chair, and a table.

15

GovLog earned no net revenues, as defined by its agreements with Gosselin Group, during the 2007 or 2008 fiscal years. As a result, GovLog was not obligated to pay any funds to Gosselin Group in exchange for Gosselin Group's business with the DOD. GovLog, however, paid Gosselin Group for the leased warehouse facilities and other Gosselin Group services. In other words, as a representative of GovLog succinctly explained, "the money that's going to GovLog is actually ending up being paid to Gosselin." See J.A. 1322.

### D.

Meanwhile, on November 7, 2007, Ammons's qui tam action was transferred from the Eastern District of Missouri to the Eastern District of Virginia, where Bunk's qui tam action remained pending. The two qui tam suits were thereafter consolidated. In 2008, after GovLog was formed, the district court ordered the Relators' complaints unsealed. On July 18, 2008, Ammons's qui tam complaint was superseded by the government's Complaint in Intervention. See 31 U.S.C. § 3730(b)(2) ("The Government may elect to intervene and proceed with the action . . . ."). The government did not, however, intervene in Bunk's qui tam suit.[10]

---

[10] Although Relator Ammons became a subordinated party upon the government's intervention in his qui tam action, he nevertheless maintained his status as a plaintiff. See 31 U.S.C. § 3730(c)(1) ("[The person bringing the action] shall have the right to continue as a party to the action . . . ."). (Continued)

16

In its Complaint in Intervention, the government named GovLog as a defendant, alleging that GovLog was "a successor/transferee in interest of Gosselin [Group]." See Compl. Int. ¶ 15. On October 2, 2008, Bunk filed his Second Amended Complaint, which also included GovLog as a named defendant and alleged a successor corporation liability claim against GovLog. In December 2009, Bunk amended his complaint again, filing his operative Third Amended Complaint (the "Bunk Complaint").

The Bunk Complaint "pleaded various FCA theories of liability against [the Gosselin defendants] and others. Suing in his individual capacity, Bunk joined several additional claims, including a 42 U.S.C. § 1985 claim . . . and state law claims." See Bunk, 741 F.3d at 398-99 (citations omitted). As we observed in Bunk, however, only his DPM claim was not superseded by the government's Complaint in Intervention:

> Although the government did not intervene in the Bunk proceeding, the district court determined that all of Bunk's claims had nonetheless been effectively superseded by the [government's Complaint in Intervention], except for Count II of the Bunk

---

Bunk's status did not change as a result of the government's intervention in Ammons's action. See id. § 3730(c)(3) ("If the Government elects not to proceed with the action, the person who initiated the action shall have the right to conduct the action.").

17

Complaint, which sought recovery under the FCA for Gosselin's actions in connection with the DPM scheme.

Id. at 399 n.8; see also Bunk Compl. ¶ 148 (alleging that the Gosselin defendants "knowingly made, used, or caused to be used a false record or statement to get a false claim paid or approved by the United States Government"). By incorporating and realleging a substantial portion of the Bunk Complaint, see Bunk Compl. ¶ 147, Count II of the Bunk Complaint alleged the successor corporation liability contention in the following terms:

> The transaction between [GovLog] and [Gosselin Group] is, knowingly, a sham transaction for inadequate consideration through which Gosselin Group . . . and/or its operating subsidiaries still profit through their business interests in shipping related to U.S. Government markets and that transaction is designed to hinder, delay and/or defraud Relators as a potential judgment creditor.

Id. ¶ 30.

On May 11, 2011, after the government and the Relators had moved for summary judgment on the issue of whether GovLog was liable as a successor corporation of Gosselin Group, the district court severed the claims against GovLog from those against the Gosselin defendants. The court then proceeded to conduct a trial, seeking to first resolve the claims against the Gosselin defendants.

18

The jury trial on the DPM, ITGBL, and Covan claims against the Gosselin defendants began in Alexandria on July 18, 2011.[11] At the close of the government's case, on July 28, 2011, the district court awarded judgment as a matter of law to the Gosselin defendants on the ITGBL claim. The DPM and Covan claims were submitted to the jury, and on August 4, 2011, the jury returned a verdict against the Gosselin defendants on the DPM claim and in favor of the Gosselin defendants on the Covan claim.

With respect to the DPM scheme, the trial evidence established that the Gosselin defendants had submitted 9,136 false invoices to the DOD. Each of those false claims authorized the imposition of a minimum civil penalty of $5,500. As we explained in our Bunk decision, the "imposition of no more than the statutory minimum . . . would have resulted in a cumulative penalty just in excess of $50 million." See 741 F.3d at 401. Nevertheless, the district court did not impose any civil penalties, ruling that such an award would be unconstitutionally punitive in violation of the Excessive Fines Clause of the Eighth Amendment. Id.

---

[11] Before the 2011 jury trial began, the district court granted partial summary judgment to the government on the Cartwright claim against the Gosselin defendants. See Bunk, 741 F.3d at 399-400.

19

Both the government and the Relators appealed, and the Gosselin defendants cross-appealed. Bunk challenged the district court's denial of civil penalties in relation to the DMP claim; the government challenged the court's award of judgment to the Gosselin defendants on the ITGBL claim; and the Gosselin defendants argued that Bunk lacked standing to sue. After rejecting the Gosselin defendants' standing argument, we directed the court to amend its civil penalties judgment and to award $24,000,000 in civil penalties to Bunk on the DPM claim. See Bunk, 741 F.3d at 404-05, 411. We explained that such an award was not unconstitutionally excessive under the Eighth Amendment, and specified that the award "appropriately reflects the gravity of Gosselin's offenses and provides the necessary and appropriate deterrent effect going forward." Id. at 409. Finally, we vacated the court's entry of judgment in favor of the Gosselin defendants on the ITGBL claim. Id. at 411. We thus remanded the matter for further proceedings.[12]

E.

In additional Bunk remand proceedings, with the claims against the Gosselin defendants having been resolved, the

---

[12] On August 1, 2014, during the remand proceedings in the district court, a jury in Alexandria returned a verdict in favor of the government on the ITGBL claim. On December 24, 2014, however, the district court granted the Gosselin defendants' renewed motion for judgment on that claim.

20

district court turned to the successor corporation liability claims that were pending against GovLog. In that regard, the court initially focused on identifying the applicable legal test for a successor corporation liability claim. The Relators requested that the court apply the substantial continuity test enunciated by this Court in United States v. Carolina Transformer Co., 978 F.2d 832 (4th Cir. 1992), as an expansion of traditional common law principles. GovLog contended, however, that use of the substantial continuity test was foreclosed by the Supreme Court's 1998 decision in United States v. Bestfoods, 524 U.S. 51 (1998). On September 12, 2014, the district court agreed with GovLog and ruled that application of Carolina Transformer's substantial continuity test in the context of the FCA would be inconsistent with Bestfoods. As a result, the court decided that only traditional common law principles would govern the issue of GovLog's liability as a successor corporation. The court then invited the parties to renew and litigate their motions for summary judgment.

Relying on a fraudulent transaction theory of successor corporation liability under the common law, the Relators and the government, on November 3, 2014, sought summary judgment with respect to the successor corporation liability claims. GovLog then cross-moved for summary judgment, also asking for judgment on the pleadings. In support of its request for judgment on the

21

pleadings, GovLog maintained that the government's Complaint in Intervention and Count II of the Bunk Complaint failed to properly allege that GovLog was liable as a successor corporation to Gosselin Group. In its summary judgment request, GovLog cast the fraudulent transaction theory posited by the government and the Relators as entirely speculative, arguing that the evidence was insufficient to create any material issues of fact, thereby entitling GovLog to summary judgment.

On December 23, 2014, the district court granted judgment to GovLog, utilizing two theories. See Decision 2-3. The Decision first concluded that neither complaint had properly alleged that GovLog was liable as a successor corporation to Gosselin Group under any recognized legal theory. Alternatively, the court concluded that GovLog was entitled to summary judgment for want of a genuine dispute of material fact. Indeed, the court ruled that the various transactions between Gosselin Group and GovLog were not shown to have been pursued with a fraudulent intention. In the court's view, there was simply "no evidence sufficient to establish any of the recognized 'badges of fraud'" with respect to the creation and operation of GovLog. Id. at 9.

The district court observed that Gosselin Group "had an absolute right to end its direct contractual relationship with the American carriers and there was nothing that could be deemed

22

fraudulent based on that decision alone," and that Gosselin Group "was not under any obligation to stay in any particular line of business in order to generate revenue to pay the judgment." See Decision 10. The Decision swept aside the government's and the Relators' contentions that the transfer lacked consideration, explaining, inter alia, that Gosselin Group "did not transfer or assign any ITGBL contracts to GovLog," and "[t]here is likewise no evidence, expert or otherwise, that the [various agreements between Gosselin Group and GovLog failed to] provide commercially reasonable terms or adequate consideration." Id. at 11-12. Accordingly, on December 29, 2014, the court entered judgment in favor of GovLog.

The Relators timely noted this appeal from the judgment. We possess jurisdiction pursuant to 28 U.S.C. § 1291.[13]

II.

At the outset, we must address GovLog's contention that the district court lacked subject matter jurisdiction over Bunk's

---

[13] The government initially appealed from the judgment in favor of GovLog, but dismissed its appeal. We thereafter requested the Attorney General to make an amicus curiae submission in the Relators' appeal. The United States has submitted a brief in support of the Relators, and government counsel participated in the oral argument of this appeal.

23

successor corporation liability claim against GovLog and that the claim thus must be dismissed. The question is whether the court possessed supplemental jurisdiction over Bunk's claim.

If a district court possesses original jurisdiction in a civil proceeding, it "shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy." See 28 U.S.C. § 1367(a). Supplemental jurisdiction "is not limited to restatements of the same basic ground for recovery." White v. Cty. of Newberry, S.C., 985 F.2d 168, 172 (4th Cir. 1993). Indeed, the related claims "need only revolve around a central fact pattern." Id. We review de novo an issue of whether subject matter jurisdiction was possessed by a district court. See Taylor v. Kellogg Brown & Root Servs., Inc., 658 F.3d 402, 408 (4th Cir. 2011).

Original jurisdiction is supplied in these qui tam proceedings by Bunk's FCA claim (i.e., the DPM claim). See 28 U.S.C. § 1331. Supplemental jurisdiction thus turns on whether the inquiry into the successor corporation liability claim against GovLog involves the same facts as the FCA claim. Here, GovLog's liability as a successor corporate entity is wholly dependent on the Gosselin defendants' liability under the FCA; that is, the facts upon which the $24,000,000 judgment against

24

the Gosselin defendants was predicated also serve as the foundation for GovLog's liability as a successor corporate entity. Simply put, those two issues "revolve around a central fact pattern." See White, 985 F.2d at 172; see also, e.g., Bd. of Trs., Sheet Metal Workers' Nat'l Pension Fund v. Elite Erectors, Inc., 212 F.3d 1031, 1037 (7th Cir. 2000) (observing that "federal courts may entertain vicarious-liability theories in a single suit" by way of supplemental jurisdiction).

Nevertheless, GovLog maintains that the district court lacked supplemental jurisdiction with respect to Bunk's successor corporation liability claim under the Supreme Court's decision in Peacock v. Thomas, 516 U.S. 349 (1996). The Peacock Court was concerned with a district court's exercise of ancillary jurisdiction over subsequent proceedings, concluding that "ancillary jurisdiction is not justified over a new lawsuit to impose liability for a judgment on a third party." Id. at 359 (emphasis added).[14] This matter is readily distinguishable from Peacock. Bunk's successor corporation liability claim against GovLog, as alleged in Count II of the Bunk Complaint, is not part of a new lawsuit; indeed, the successor corporation

---

[14] In Peacock, the Supreme Court recognized that "Congress codified much of the common-law doctrine of ancillary jurisdiction as part of 'supplemental jurisdiction' in 28 U.S.C. § 1367." See 516 U.S. at 354 n.5.

25

liability question is part and parcel of Bunk's original qui tam action. Accordingly, the Peacock principle is inapplicable here, and the district court's exercise of supplemental jurisdiction over the successor corporation liability claim against GovLog was entirely appropriate.

III.

Turning to the heart of this appeal, we must assess and decide whether the district court erred by entering judgment in favor of GovLog on the successor corporation liability issue. In the district court, Bunk pressed two theories of successor corporation liability against GovLog: (1) the substantial continuity theory, and (2) the fraudulent transaction theory. After an opening round of briefing, the court rejected the substantial continuity test, deeming it inconsistent with Supreme Court precedent. Additional briefing ensued, and the court's Decision ruled that Bunk had not adequately pleaded the fraudulent transaction theory. In the alternative, the Decision determined that the fraudulent transaction theory of successor corporation liability was without evidentiary support, leaving no genuine issue of material fact and entitling GovLog to summary judgment. On appeal, Bunk challenges each of those rulings.

A.

As a general rule, a corporation that acquires the assets of another corporation does not also acquire its liabilities. See United States v. Carolina Transformer Co., 978 F.2d 832, 838 (4th Cir. 1992). The traditional rule against successor corporation liability, however, is subject to four exceptions under the federal common law. That is, a successor corporation takes on the liabilities of its predecessor if

> (1) the successor expressly or impliedly agrees to assume the liabilities of the predecessor; (2) the transaction may be considered a de facto merger; (3) the successor may be considered a "mere continuation" of the predecessor; or (4) the transaction is fraudulent.

Id.[15]

---

[15] That federal common law principles apply in this matter is not undisputed. GovLog argued in its brief for the application of Belgian law, premised on choice-of-law provisions in contractual agreements it had with Gosselin Group. See, e.g., J.A. 314 (providing that any disputes arising under agreement between GovLog and Gosselin Group shall be determined by Belgian law); id. at 321 (same). We are satisfied that Belgian law does not apply because GovLog cannot foist upon Bunk a choice-of-law provision contained in an agreement between GovLog and Gosselin Group. See Berg Chilling Sys., Inc. v. Hull Corp., 435 F.3d 455, 466 (3d Cir. 2006) ("In general, while it makes sense to allow the parties to a contract to control which law applies to their agreement, it does not follow that the contract provisions should control an inquiry that, by its nature, looks beyond the contract."). Although there yet may be some question of whether principles of federal common law or Virginia law apply here, the parties have not argued that point. In any event, Virginia law does not meaningfully diverge from federal common law concerning successor corporation liability. Notably, federal common law and Virginia law both recognize the
(Continued)

27

The mere continuation theory authorizes the imposition of liability if, "after the transfer of assets, only one corporation remains, and there is an identity of stock, stockholders, and directors between the two corporations." Carolina Transformer, 978 F.2d at 838. Bunk is unable to rely on the mere continuation theory because the two corporations — GovLog and Gosselin Group — were both viable after the transfer.

Bunk therefore relies on the more lax substantial continuity theory conceived in Carolina Transformer. Substantial continuity expands on the mere continuation theory, allowing a court to look at an ensemble of at least eight factors to determine whether successor corporation liability should be imposed. See Carolina Transformer, 987 F.2d at 838 (identifying relevant factors as "(1) retention of the same employees; (2) retention of the same supervisory personnel; (3) retention of the same production facilities in the same location; (4) production of the same product; (5) retention of the same name; (6) continuity of assets; (7) continuity of

---

traditional exceptions to the rule against successor corporation liability. Compare, e.g., Carolina Transformer, 978 F.2d at 838, with Harris v. T.I., Inc., 413 S.E.2d 605, 609 (Va. 1992). Both bodies of law also look to and apply what are called "badges of fraud" to determine whether a conveyance was fraudulent. Compare BFP v. Resolution Tr. Corp., 511 U.S. 531, 540-41 (1994), with Fox Rest Assocs., L.P. v. Little, 717 S.E.2d 126, 131-32 (Va. 2011). In the circumstances, we are satisfied to apply federal common law.

general business operations; and (8) whether the successor holds itself out as the continuation of the previous enterprise").

As the Supreme Court instructed in United States v. Bestfoods, however, "the failure of [a] statute to speak to a matter as fundamental as the liability implications of corporate ownership demands application of the rule that '[i]n order to abrogate a common-law principle, the statute must speak directly to the question addressed by the common law.'" See 524 U.S. 51, 63 (1998) (second alteration in original) (quoting United States v. Texas, 507 U.S. 529, 534 (1993)). Put simply, the FCA does not speak to successor corporation liability and thus has no impact on the traditional common law principles governing successor corporation liability. It follows that Carolina Transformer's substantial continuity theory — a theory that alters the common law mere continuation rule — is not a viable theory for Bunk to pursue. Accordingly, we are satisfied that the district court properly declined to apply the substantial continuity test here.

B.

Without the substantial continuity theory, Bunk must rely on the fourth exception identified in our Carolina Transformer decision — the fraudulent transaction theory of successor corporation liability. The district court, however, rejected Bunk's allegations as insufficient with respect to that theory.

29

See Decision 2 n.3 ("The Court concludes that the plaintiffs had not, prior to the current round of summary judgment proceedings, adequately placed GovLog on notice of . . . their fraudulent transaction theory."). We must therefore initially assess de novo whether the relevant pleading was legally sufficient. See Teachers' Retirement Sys. of La. v. Hunter, 477 F.3d 162, 170 (4th Cir. 2007).

In general, to survive dismissal, a complaint must "state a claim to relief that is plausible on its face" by alleging factual matter to support the claims asserted. See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). More may be required, however, when a successor corporation liability claim is being pursued under the fraudulent transaction theory. In that circumstance, the complaint may need to satisfy the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure. Compare, e.g., Ricciardello v. J.W. Gant & Co., 717 F. Supp. 56, 59 (D. Conn. 1989) ("If plaintiff purports to rely on fraud to impose successor liability . . . , he must plead with particularity facts from which fraud may be inferred." (citing Fed. R. Civ. P. 9(b))), with Old Republic Ins. Co. v. Hansa World Cargo Serv., Inc., 170 F.R.D. 361, 376 (S.D.N.Y. 1997) ("[P]leadings of successor liability are subject to the lenient pleading requirements of Rule 8(a), not the more

30

rigorous standards of Rule 9(b).”). In this proceeding, however, we need not either assess or decide whether Rule 9(b)'s pleading requirements apply to a fraud-based successor liability claim. That is because, assuming those standards are applicable, they are readily satisfied here.

Pursuant to Rule 9(b), the plaintiff must “state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.” See Fed. R. Civ. P. 9(b). Although we must view the facts alleged in the operative complaint in the light most favorable to the plaintiff, “we will not accept ‘legal conclusions couched as facts or unwarranted inferences, unreasonable conclusions, or arguments.'” See Nathan, 707 F.3d at 455 (quoting Wag More Dogs, LLC v. Cozart, 680 F.3d 359, 365 (4th Cir. 2012)). In simple terms, a plaintiff complies with Rule 9(b) by, “at a minimum, describ[ing] the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby.” See Smith v. Clark/Smoot/Russell, 796 F.3d 424, 432 (4th Cir. 2015) (quoting United States v. Triple Canopy, Inc., 775 F.3d 628, 634 (4th Cir. 2015)). As a general rule, as we have recognized, a court “should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made

31

aware of the particular circumstances for which she will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts." Id. (quoting Harrison v. Westinghouse Savannah River Co., 176 F.3d 776, 784 (4th Cir. 1999)).

By incorporating and realleging a substantial portion of the Bunk Complaint, see Bunk Compl. ¶ 147, Count II of the Bunk Complaint alleges that, "in or about June 2007, two former employees of [Gosselin Group] formed [GovLog], hired over twenty (20) employees of [Gosselin Group] and . . . entered into agreements with [Gosselin Group] to purchase all of [its] business interests in shipping related to U.S. Government markets." Id. ¶ 30. Gosselin Group and GovLog, as Count II further alleges, then entered into various service agreements "to enable [GovLog] to be able to provide services related to the U.S. Government markets." Id. Count II also alleges that GovLog "hold[s] itself out as a continuation of [Gosselin Group]" and that Gosselin Group continues to reap profits from its former contracts, all the while avoiding any liabilities for its past misdeeds. Id.

It is thus apparent that the allegations of Count II sufficiently outline the dealings between GovLog and Gosselin Group that form a solid foundation for the fraudulent transaction theory. As a result, those allegations satisfy the

32

mandate of Rule 9(b). In dismissing Bunk's successor corporation liability claim as insufficiently pleaded, the district court erred.

## C.

Finally, as an alternative to its ruling that the successor corporation liability claim was insufficiently pleaded, the district court awarded summary judgment to GovLog on the merits. In the court's view, "there [was] an absence of evidence sufficient" to support Bunk's fraudulent transaction theory. See Decision 3. Bunk challenges that ruling and requests that we remand for trial and further proceedings, or for entry of summary judgment in Bunk's favor. We review de novo whether a district court's summary judgment award was warranted. See Bauer v. Lynch, 812 F.3d 340, 347 (4th Cir. 2016).

## 1.

The fraudulent transaction theory turns on the intention underlying the transfer of assets to GovLog, i.e., whether it was made with an actual intention to hinder, delay, or defraud creditors. See, e.g., BFP, 511 U.S. at 540; see also, e.g., 15A William Meade Fletcher et al., Fletcher Cyclopedia of the Law of Corporations § 7403, Westlaw (database updated Sept. 2016) ("Many jurisdictions provide that a transfer is fraudulent if made with actual intent to hinder, delay or defraud creditors."). Because direct evidence of such an intention is a

rarity, courts generally look to indirect and circumstantial evidence for "badges of fraud":

> Since . . . fraudulent intent is found by facts and circumstances, it is subject to indirect proof, with the following recognized as "badges of fraud": (1) a conveyance to a spouse or near relative; (2) inadequacy of consideration . . . ; (3) transactions that are different from the usual method of transacting business; (4) transfers in anticipation of suit or execution; (5) retention of possession by the debtor; (6) the transfer of all or nearly all of the debtor's property; (7) insolvency caused by the transfer; or (8) failure to produce rebutting evidence when circumstances surrounding the transfer are suspicious.

Fletcher et al., supra, § 7403 (footnotes omitted); see also, e.g., Aiken v. United States, 108 F.2d 182, 183 (4th Cir. 1939) ("Fraudulent intent, as a mental element of crime . . . is too often difficult to prove by direct and convincing evidence. In many cases it must be inferred from a series of seemingly isolated acts and instances which have been rather aptly designated as badges of fraud."); Fox Rest Assocs., 717 S.E.2d at 131-32 (enumerating badges of fraud). Also among the badges of fraud are "transactions whereby the debtor retains benefits." See 37 Am. Jur. 2d Fraudulent Conveyances & Transfers § 14, Westlaw (database updated Sept. 2016).

Of importance, the issue of fraudulent intention is generally not amenable to resolution on summary judgment. See Morrison v. Nissan Motor Co., 601 F.2d 139, 141 (4th Cir. 1979) ("[W]hen the disposition of a case turns on a determination of

34

intent, courts must be especially cautious in granting summary judgment, since the resolution of that issue depends so much on the credibility of the witnesses, which can best be determined by the trier of facts after observation of the demeanor of the witnesses during direct and cross-examination."). Moreover, when evidence of intention is ambiguous, summary judgment simply cannot be awarded. See Gen. Analytics Corp. v. CNA Ins. Cos., 86 F.3d 51, 55 (4th Cir. 1996).

## 2.

In this situation, the evidence not only fails to dispel the requisite fraudulent intention, but could easily be found to establish it. Indeed, Smet's own words provide substantial insight into — and direct evidence of — his fraudulent and iniquitous intention. Before hatching his scheme to move Gosselin Group's business with the United States into the hands of GovLog, Smet had been indicted by the federal grand jury for his involvement in the bid-rigging scheme. Although that indictment was later dismissed, Smet admitted to strikingly incriminating facts and was prohibited from doing business with the United States for three years.

After the criminal proceedings against Gosselin Group were concluded, the DOJ informed Smet of these qui tam proceedings, in which the government subsequently intervened. At the cusp of the qui tam proceedings, as others testified, Smet loudly voiced

35

his frustration with the "whole criminal case [against Gosselin] and everything around it" and that he was "really fed up with all those chasings towards his person." See J.A. 675, 703. Any reasonable juror could readily conclude that those sentiments — expressed on the eve of GovLog's creation — demonstrate Smet's fraudulent intention to escape liability for any potential judgment and to dodge "those chasings" being pursued by the United States.

The transaction between Gosselin Group and GovLog is also adorned with several of the badges of fraud. Those badges readily support Bunk's position concerning the fraudulent intention underlying the GovLog transaction. At least four of the badges of fraud are readily apparent on the evidence as forecast:

- Inadequacy of consideration. See 15A Fletcher et al. supra, § 7403; see also, e.g., In re Woodfield, 978 F.2d 516, 518 (9th Cir. 1992), cited by In re Sandoval, 153 F.3d 722 (4th Cir. 1998) (unpublished table decision); Fox Rest Assocs., 717 S.E.2d at 132.

- Transactions that are different from the usual method of transacting business. See 15A Fletcher et al., supra, § 7403; see also, e.g., Aiken, 108 F.2d at 183.

- Transactions in anticipation of suit or execution. See 15A Fletcher et al., supra, § 7403; see also, e.g., In re Woodfield, 978 F.2d at 518, cited by In re Sandoval, 153 F.3d 722; Fox Rest Assocs., 717 S.E.2d at 132.

36

- Transactions through which the debtor retains benefits. <u>See</u> 37 Am. Jur. 2d <u>Fraudulent Conveyances & Transfers</u> § 14, Westlaw (database updated Sept. 2016); <u>see also, e.g.</u>, <u>In re Kaiser</u>, 722 F.2d 1574, 1582 (2d Cir. 1983).

First, the consideration that GovLog paid to acquire Gosselin Group's business interests could be found to be grossly inadequate. GovLog did not pay for Gosselin Group's business with the United States upon transfer. Instead, GovLog agreed to pay Gosselin Group a percentage of GovLog's future net revenues, which their agreements defined as "all of those revenues received by GovLog . . . minus the amount of the [services] invoiced by [Gosselin Group] to GovLog in connection with" the services provided to GovLog by Gosselin Group and its subsidiaries. <u>See</u> J.A. 832 (emphasis omitted) (regarding facility services); <u>see also</u> <u>id.</u> at 839 (regarding support services). GovLog did not, however, net any revenues. In effect, therefore, GovLog paid nothing for the business interests it received pursuant to the GovLog transaction.

Next, the GovLog transaction could be found to have been conducted in a manner different from the usual method of transacting business. After approaching Lefebure with his scheme to resurrect the then-defunct Brabiver as a business entity flush with Gosselin Group's government contracts, the plan unfolded quickly and suspiciously. At the outset, Smet made interest-free loans, totalling approximately €100,000, to

37

four hand-picked GovLog principals — each of whom worked for Gosselin Group or one of its subsidiaries. The very next day, Smet's cronies used those loans to purchase Brabiver and to formalize its recasting as GovLog, a name selected by Smet. The following day, without conducting any financial analysis of the transaction, GovLog consummated the transaction by entering into a series of agreements with Gosselin Group. Those agreements were prepared by Smet's attorneys and presented to GovLog's principals for execution without any negotiations. The GovLog transaction was thus made in haste and with little input from GovLog or its purported owners, with Smet in control of every facet.

Even more suspicious is the timing of the Gosselin Group-GovLog transaction, which could be found to have been made in anticipation of suit or execution. In 2003, Smet and Gosselin Group were indicted for their bid-rigging scheme. In 2004, Gosselin Group pleaded guilty and was convicted. In exchange, the government agreed to dismiss Smet's indictment. Although he escaped criminal liability, Smet was prohibited from doing business with the United States for three years. At the conclusion of the criminal proceedings against Gosselin Group and Pasha, Gosselin Group was fined $6,000,000 and ordered to make nearly $1,000,000 in restitution to the DOD.

38

After the successful criminal prosecution of Gosselin Group, the Gosselin defendants first learned in September 2006 of these qui tam proceedings seeking to impose civil liability for the bid-rigging conspiracy.  By December 2006, the Gosselin defendants knew that the government might well intervene in the qui tam proceedings; by January 2007, the Gosselin defendants had received a settlement demand from the DOJ.  Facing civil liability for the bid-rigging conspiracy — and just a month after receiving the government's settlement demand — Smet approached Lefebure with his GovLog scheme to move Gosselin Group's business with the United States into the new business entity.  By July 1, 2007, Smet had orchestrated the creation and funding of GovLog and its acquisition of Gosselin Group's business with the United States.  In sum, the temporal proximity of the Gosselin defendants' being advised of the qui tam actions and the GovLog transaction being consummated suggests that the transaction was made to defraud Bunk and the United States out of civil penalties.

Finally, a reasonable juror could find that Gosselin Group, despite having moved its business with the United States into the hands of GovLog, continued to reap the benefits of that business.  GovLog did not provide shipping services; instead, it signed contracts with the DOD and arranged for shipping services.  Gosselin Group actually performed those shipping

39

services, and it also leased warehousing facilities to GovLog. At bottom, all the monies paid to GovLog for its "shipping services" ended up in Gosselin Group's coffers. As a result, Gosselin Group retained all the benefits of the business interest it purported to have sold to GovLog. See J.A. 1322 ("[T]he money that's going to GovLog is actually ending up being paid to Gosselin.").

Seeking to dispel the impact of all this compelling evidence, GovLog offers an alternative basis for the GovLog transaction. According to GovLog, Smet was merely selling Gosselin Group's business with the United States for practical business reasons. As Smet testified during his deposition,

> I thought it was beneficial to the company to be able to give this business to another company and still to some degree allow the Gosselin companies to continue to provide some logistical support service to the new company that took over these contracts and continue to handle that business so we could still make some money off this business and not get stuck with high severance pays on all the employees.

J.A. 927. Although Smet's explanation for the GovLog transaction could counter the evidence of fraud forecast by Bunk, this explanation could well be rejected by a reasonable juror. In sum, the various factual disputes presented here are simply incapable of resolution except by a factfinder. Importantly, there is a great deal of evidence — when viewed in

40

the proper light — to prove fraudulent intention and that evidence is both direct and circumstantial.

Accordingly, the district court erred in making the summary judgment award to GovLog. We are therefore satisfied to remand this matter for further proceedings.

## IV.

Pursuant to the foregoing, we vacate the judgment and remand for such other and further proceedings as may be appropriate.

<u>VACATED AND REMANDED</u>